# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**LAURA WILLIAMSON,**

    **Plaintiff,**

v.                                                        Case No:   6:18-cv-767-Orl-31TBS

**DIGITAL RISK, LLC, DIGITAL RISK
MORTGAGE SERVICES, LLC,
MPHASIS CORPORATION and
MPHASIS LIMITED, INC.,**

    **Defendants.**

## ORDER

This Matter comes before the Court without a hearing on the Defendants' Partial Motion to Dismiss (Doc. 10), the Plaintiff's Response (Doc. 12), the Defendants' Reply (Doc. 17), and the Plaintiff's Sur-Reply (Doc. 20).

### I.    Background

The Plaintiff began working as a senior operations manager for Digital Risk, LLC and Digital Risk Mortgage Services, LLC (collectively, "Digital Risk") in 2010. Doc. 1 ¶ 11. In 2012, a conglomerate of Mphasis Corporation and Mphasis Limited, Inc. purchased both of the Digital Risk entities. *Id.* ¶ 12. Because the four defendants are so highly integrated, the Court will refer to them collectively as the "Defendants."

In 2014, Seshagiri Dhanyamraju ("Sesha") became the Chief Executive Officer of Digital Risk. *Id.* ¶ 16. The Complaint alleges that Sesha treated the Plaintiff poorly because she was female, and that this treatment worsened when he learned she received more compensation than he did. The Plaintiff claims that in December of 2014, Sesha even placed an employee's desk mere feet away

from the Plaintiff's office door, so that he could act as a spy; multiple people advised the Plaintiff that that employee was "spying" on her, and his desk remained by her office door for over a year. *Id.* ¶ 20.

In 2016, managing member Jeffrey Taylor explained to the Plaintiff that Sesha treated her the way he did she because she was "a 'female making more money than him,' and that he had 'a very big problem with that.'" *Id.* ¶ 21. According to the Complaint, other company leaders, such as Puneet Bhirani, participated in harassing and intimidating the Plaintiff, along with the other female employees, refusing to make eye contact with them or shake their hands and berating them with raised voices during meetings. *Id.* ¶ 22. On numerous occasions, Taylor advised the Plaintiff that "the Indians" did not like the fact that a woman would make as much money as the Plaintiff made, but assured her that he would protect her. *Id.* ¶ 24. Nevertheless, Taylor reassigned some of the Plaintiff's accounts to other employees in 2016. The given rationale was that she was making too much money and that the male employees needed to make more money. *Id.* ¶ 25.

Later in 2016, the "Plaintiff became engaged to be married." *Id.* ¶ 27. Taylor allegedly assumed that the Plaintiff would not continue to work after she got married, and the Plaintiff claims that after she got engaged, the discrimination increased. *Id.* She was given difficult travel schedules, excluded from important meetings, limited in her opportunities to obtain client accounts, and not permitted to work remotely. *Id.* ¶ 29. One of her clients allegedly groped her and repeatedly "propositioned Plaintiff for oral sex," but Taylor refused to remove her from that client's account and she was forced to meet with him numerous times, despite his inappropriate conduct. *Id.* ¶ 30. "Throughout 2016 and 2017, the Defendants stopped allocating resources to Plaintiff's deals, her accounts, and her clients." *Id.* ¶ 31. Even when the Plaintiff brought in clients, those clients were apparently placed with male colleagues instead. Mr. Taylor explained that transferring the Plaintiff's

clients would remove the "target" she had on her back for making more money than her male contemporaries, and that she was making "enough" money, considering the fact that she was female. *Id.* ¶ 32-33.

At one point, the Plaintiff was falsely accused of saying "shush" during a phone call, but a subsequent human resources investigation resulted in a failure to find fault on the Plaintiff's part. *Id.* ¶ 34-35. According to the Complaint, both Taylor and the Defendants' Chief Legal Officer "advised Plaintiff that she was being unfairly targeted and singled out because she was one of the highest-ranked females within the organization." *Id.* ¶ 36. Although the Plaintiff formally complained about being discriminated against, the Defendants did not investigate the allegations. *Id.* ¶ 37. The Plaintiff claims that Taylor warned her against hiring a lawyer to address the discrimination, saying that "'the Indians would view it as an attack, that they 'would play dirty,' that her 'days would be numbered,' and that her career would be over." *Id.* ¶ 38.

In or about August of 2017, Taylor allegedly told the Plaintiff that he could no longer protect her from being targeted. *Id.* ¶ 40. According to the Complaint, Taylor kept her sales goals the same, but began to take away the Plaintiff's remaining accounts and clients, thus reducing her commission-based income and making it impossible to meet her sales goals. *Id.* On January 10, 2018, the Plaintiff retained an attorney, who sent a letter to the Defendants advising them that the Plaintiff was going to file an EEOC complaint. *Id.* ¶ 42. The Defendants terminated her employment within 48 hours after receiving that notification. *Id.* ¶ 43. The Plaintiff claims that the Defendants would not "cooperate in the cash-out of her stock options, which were fully vested and for which she was already taxed." *Id.* ¶ 44. On a conference call with multiple members of his teams, Taylor , "in order to appease the remaining employees' curiosity," falsely stated that the Plaintiff was terminated for violating company policy. *Id.* ¶ 45. The next week, Bhirani stated on a conference call "with the

companies' operations leaders" that the Plaintiff had both violated company policy and engaged in a criminal infraction. *Id.* Taylor allegedly told the Plaintiff's clients that she no longer worked with the Defendants because she was unable to keep up with company changes, that she was having business failures, and that she was not performing up to par. *Id.*

The Plaintiff filed her Complaint on May 17, 2018. Doc. 1. Count I alleges Title VII Gender Discrimination; Count II alleges Title VII Gender-Based Harassment; Count III alleges Title VII Retaliation; Count IV alleges Equal Pay Act Discrimination; Count V alleges Florida Civil Rights Act Gender Discrimination; Count VI alleges Florida Civil Rights Act Gender-Based Harassment; Count VII alleges Florida Civil Rights Act Retaliation; Count VIII alleges discrimination in violation of Florida Statute Section 725.07; Count IX alleges both negligent and intentional infliction of emotional distress; Count X alleges defamation *per se*; and Count XI alleges breach of contract.

On June 25, 2018, the Defendants filed a Partial Motion to Dismiss Counts VIII, IX, X, and XI of the Complaint. Doc. 10. The Plaintiff filed a Response on July 2, 2018. Doc. 12. The Defendants replied on July 13, 2018. Doc. 17. On July 18, 2018, the Plaintiff filed a Sur-Reply. Doc. 20.

**II.     Legal Standards**

In ruling on a motion to dismiss, the Court must view the complaint in the light most favorable to the Plaintiff, *see, e.g., Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994), and must limit its consideration to the pleadings and any exhibits attached thereto. *See* Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor. *See Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). However, "conclusory allegations, unwarranted factual

deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (citing Fed. R. Civ. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001).

### III. Analysis

### A. Florida Equal Pay Act and Intentional Infliction of Emotional Distress: Counts VIII and IX

The Plaintiff has agreed that dismissal of her claim for violation of the Florida Equal Pay Act and her claim for Intentional Infliction of Emotional Distress is appropriate. Doc. 12 at 3. Additionally, in their Reply, the Defendants represented that the Plaintiff agreed that her claim for Negligent Infliction of Emotional Distress should be dismissed. Doc. 17 at 1. Accordingly, Counts VIII and IX will be dismissed with prejudice.

### B. Defamation *Per Se*: Count X

To state a claim for defamation, "a plaintiff must allege that (1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff." *Valencia v. Citibank Int'l*, 728 So.2d 330, 330 (Fla. 3d DCA 1999). Under Florida law, "[d]efamation encompasses both libel and slander." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378 n.11 (S.D. Fla. 2006) (internal quotations and citation omitted).

Under Florida law, statements can be defamatory *per se*. *See Hoch v. Rissman*, 742 So. 2d 451, 457 (Fla. 5th DCA 1999). A statement is defamatory *per se*, "if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. 4th DCA) (internal quotations and citations omitted). In other words, the statements are "so obviously defamatory" and "damaging to [one's] reputation" that they "give[ ] rise to an absolute presumption both of malice and damage." *Wolfson v. Kirk*, 273 So.2d 774, 776 (Fla. 4th DCA 1973); *see Campbell v. Jacksonville Kennel Club, Inc.*, 66 So.2d 495, 497 (Fla. 1953).

In an action for defamation *per se*, consideration is given only to the four corners of the publication, and the language used should be interpreted as the "common mind" would normally understand it. *O'Neal v. Tribune Co.*, 176 So. 2d 535. The "'common mind' rule simply means that the words should be given a reasonable construction in view of the thought intended to be conveyed and that which would be a reasonable construction of the language by those who heard [the] same." *Wolfson*, 273 So. 2d at 778.

While the Plaintiff does not identify all of those to whom the allegedly defamatory statements were made, she does identify specific groups of people: members of Taylor's teams, Defendants' operations leaders, and the Plaintiff's former clients. Identifying specific groups of people to whom defamatory statements were published is sufficient; a plaintiff is not required to identify every individual member of each group by name. *See Ward v. Triple Canopy, Inc.*, No. 8:17-cv-802-T-24-MAP, 2017 WL 3149431, at *3 (M.D. Fla. July 25, 2017) (finding that identifying groups, such as the Department of State or the Department of Energy, to which the statements were published was sufficient).

The Defendants argue that the Plaintiff failed to allege a publication as to the Defendants' employees. "When a corporation is accused of defamation, 'statements made to corporate executive or managerial employees of that entity are, in effect, being made to the corporation itself, and thus lack the essential element of publication.'" *Bush v. Raytheon Co.*, 373 F. App'x 936, 941 (11th Cir. 2010) (quoting *Am. Airlines, Inc. v. Geddes*, 960 So.2d 830, 833 (Fla. 3d DCA 2007)). However, whether the members of Taylor's teams and the operations leaders were "corporate executive or managerial employees" is a question of fact. Additionally, the fact that there are four business entities named as Defendants in this lawsuit complicates the matter. It is not clear for which entity the people to whom the allegedly defamatory statements were published worked.

Although the Defendants argue otherwise, the allegedly defamatory statements are not pure opinion; they are readily capable of being proven false. Either the Plaintiff violated company policy and committed a criminal infraction, or she did not. Either she failed to keep up with company changes, or she did not. The statements are not pure opinion, but factual claims, and the allegations in the Complaint indicate that those claims were false.

The Defendants contend that statements made by Taylor and Bhirani to employees are protected by privilege. "[A] publication in regard to business made by one having an interest therein and solely to others having an interest in the business is privileged." *Schreidell v. Shoter*, 500 So. 2d 228, 232 (Fla. 3d DCA 1986)). However, even assuming the allegedly defamatory statements were privileged, that privilege may be overcome, if the Plaintiff can show that they were made with express malice. *Id.* Express malice is present when "the defendant's primary motive in making the statements was the intent to injure the reputation of the plaintiff." *DelMonico v. Traynor*, 116 So. 3d 1205, 1215 (Fla. 2013). The facts alleged in the Complaint support such a motive on the part of

the Defendants. Taking the Plaintiff's allegations as true, a reasonable inference can be drawn that the Defendants' motive was to injure the Plaintiff's reputation.

### C. Breach of Contract: Count XI

Under Florida law, to prevail on a breach of contract claim, plaintiff must establish "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 857 F. Supp. 2d 1294, 1301 (S.D. Fla. 2012) (quoting *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009)). A contract is not enforceable unless "'there has actually been a meeting of the minds of the parties upon definite terms and conditions which include the essential elements of a valid contract.'" *Leopold v. Kimball Hill Homes Fla., Inc.*, 842 So. 2d 133, 136 (Fla. 2d DCA 2003) (quoting *Mehler v. Huston*, 57 So.2d 836, 837 (Fla. 1952)). "Furthermore, to prove a breach of an oral contract, a plaintiff must establish that the parties mutually assented to a certain and definite proposition and left no essential terms open." *Merle Wood & Assocs., Inc.*, 857 F. Supp. 2d at 1301 (internal quotation marks and citations omitted).

The Plaintiff claims that she had an oral contract with her employer, and that her employer did not properly compensate her according to the terms of that oral contract, causing her to suffer damages. Doc. 12 at 14. The Defendants argue that such an oral contract would be barred by the Statute of Frauds. Oral contracts that are capable of performance within one year are not barred. *First Realty Inv. Corp. v. Gallaher*, 345 So. 2d 1088, 1089 (Fla. 3d DCA 1977). However, the Complaint does not include sufficient facts from which the Court could conclude that the alleged oral contract was capable of being performed within one year. Additionally, the Complaint lacks adequate detail in alleging the essential terms of the oral contract and what particular actions constituted the breach of that contract. Accordingly, Count XI will be dismissed without prejudice.

### IV. Conclusion

For the foregoing reasons, the Defendants' Partial Motion to Dismiss (Doc. 10) is **GRANTED IN PART** and **DENIED IN PART**. Counts VIII and IX are hereby **DISMISSED** with prejudice. Count XI is **DISMISSED** without prejudice. If the Plaintiff wishes to file an amended complaint, she may do so within twenty-one (21) days of the date of this Order.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 15, 2018.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party