**LAURA WILLIAMSON,**

**Plaintiff,**

**v.**                                              Case No:   **6:18-cv-767-Orl-31EJK**

**DIGITAL RISK, LLC, DIGITAL RISK**
**MORTGAGE SERVICES, LLC,**
**MPHASIS CORPORATION and**
**MPHASIS LIMITED, INC.,**

**Defendants.**

_____

## ORDER

This Matter comes before the Court without a hearing on the Defendants' Motion for Summary Judgment (Doc. 95), the Plaintiff's Response (Doc. 107), and the Defendants' Reply (Doc. 116).

### I.     Factual Background

The Plaintiff began working as a senior operations manager for Digital Risk, LLC and Digital Risk Mortgage Services, LLC (collectively, "Digital Risk") in 2010. Doc. 33 ¶ 99. In 2012, a conglomerate of Mphasis Corporation and Mphasis Limited, Inc. purchased both of the Digital Risk entities. *Id.* ¶ 11. Because the four defendants are so highly integrated, the Court will refer to them collectively as the "Defendants."

In 2014, Seshagiri Dhanyamraju ("Sesha") became the Chief Executive Officer of Digital Risk. *Id.* ¶ 15. The Second Amended Complaint alleges that Sesha treated the Plaintiff poorly because she was female, and that this treatment worsened when he learned she received more compensation than he did. The Plaintiff claims that in December of 2014, Sesha even placed an

employee's desk mere feet away from the Plaintiff's office door, so that he could act as a spy; multiple people advised the Plaintiff that that employee was "spying" on her, and his desk remained by her office door for over a year. *Id.* ¶ 19.

In 2016, managing member Jeffrey Taylor first explained to the Plaintiff that Sesha treated her the way he did she because she was "a 'female making more money than him,' and that he had 'a very big problem with that.'" *Id.* ¶ 20. According to the Second Amended Complaint, other company leaders, such as Puneet Bhirani, participated in harassing and intimidating the Plaintiff, along with the other female employees, refusing to make eye contact with them or shake their hands and berating them with raised voices during meetings. *Id.* ¶ 21. Taylor again advised the Plaintiff that "the Indians" did not like the fact that a woman would make as much money as the Plaintiff made, but assured her that he would protect her. *Id.* ¶ 24. Nevertheless, Taylor reassigned some of the Plaintiff's accounts to other employees in 2016. The given rationale was that she was making too much money and that the male employees needed to make more money. *Id.* ¶ 24.

Later in 2016, the "Plaintiff became engaged to be married." *Id.* ¶ 26. Taylor allegedly assumed that the Plaintiff would not continue to work after she got married, and the Plaintiff claims that after she got engaged, the discrimination increased. *Id.* She was given difficult travel schedules, excluded from important meetings, limited in her opportunities to obtain client accounts, and not permitted to work remotely. *Id.* ¶ 28. One of her clients allegedly groped her and repeatedly "propositioned Plaintiff for oral sex," but Taylor refused to remove her from that client's account and she was forced to meet with him numerous times, despite his inappropriate conduct. *Id.* ¶ 29. "Throughout 2016 and 2017, the Defendants stopped allocating resources to Plaintiff's deals, her accounts, and her clients." *Id.* ¶ 30. Even when the Plaintiff brought in clients, those clients were apparently placed with male colleagues instead. Mr. Taylor explained that transferring the Plaintiff's

clients would remove the "target" she had on her back for making more money than her male contemporaries, and that she was making "enough" money, considering the fact that she was female. *Id.* ¶ 31-32.

At one point, the Plaintiff was falsely accused of saying "shush" during a phone call, but a subsequent human resources investigation resulted in a failure to find fault on the Plaintiff's part. *Id.* ¶ 33-34.

According to the Second Amended Complaint, both Taylor and the Defendants' Chief Legal Officer "advised Plaintiff that she was being unfairly targeted and singled out because she was one of the highest-ranked females within the organization." *Id.* ¶ 35. Although the Plaintiff formally complained about being discriminated against, the Defendants did not investigate the allegations. *Id.* ¶ 36. The Plaintiff claims that Taylor warned her against hiring a lawyer to address the discrimination, saying that "'the Indians would view it as an attack, that they 'would play dirty,' that her 'days would be numbered,' and that her career would be over." *Id.* ¶ 37.

In or about August of 2017 , Taylor allegedly told the Plaintiff that he could no longer protect her from being targeted. *Id.* ¶ 39. According to the Second Amended Complaint, Taylor kept her sales goals the same, but, as time went on, began to take away the Plaintiff's remaining accounts and clients, thus reducing her commission-based income and making it impossible to meet her sales goals. *Id.* On January 10, 2018, the Plaintiff retained an attorney, who sent a letter to the Defendants advising them that the Plaintiff was going to file an EEOC complaint. Doc. 108-23. The Defendants terminated her employment within 48 hours after receiving that notification. Doc. 108-57, Taylor Dep., 153:20-154:6. The Plaintiff claims that the Defendants would not "cooperate in the cash-out of her stock options, which were fully vested and for which she was already taxed." Doc.

33 ¶ 43. On a conference call with multiple members of his teams, Taylor stated that the Plaintiff was terminated for violating company policy. Doc 108-57, Taylor Dep. 154:9-13.

The next week, Bhirani stated on a conference call "with the companies' operations leaders" that the Plaintiff had violated company policy. Doc. 33 ¶ 43. Taylor allegedly told the Plaintiff's clients that she no longer worked with the Defendants because she was unable to keep up with company changes, that she was having business failures, and that she was not performing up to par. *Id.*

## II.    Procedural History

The Plaintiff filed her original Complaint on May 17, 2018. Doc. 1. Count I alleged Title VII Sex Discrimination; Count II alleged Title VII Sex-Based Harassment; Count III alleged Title VII Retaliation; Count IV alleged Equal Pay Act Discrimination; Count V alleged Florida Civil Rights Act Sex Discrimination; Count VI alleged Florida Civil Rights Act Sex-Based Harassment; Count VII alleged Florida Civil Rights Act Retaliation; Count VIII alleged discrimination in violation of Florida Statute Section 725.07; Count IX alleged both negligent and intentional infliction of emotional distress; Count X alleged defamation per se; and Count XI alleged breach of contract.

On June 25, 2018, the Defendants filed a Partial Motion to Dismiss Counts VIII, IX, X, and XI of the Complaint. Doc. 10. The Court granted that motion in part and dismissed Counts VIII and IX (with prejudice) and Count XI (without prejudice). Doc. 25. The Plaintiff later amended her complaint with respect to Count XI, which became Count IX of the Amended Complaint. Doc. 26. The Court granted the Defendants' Motion to Dismiss Count IX but gave the Plaintiff one more chance to adequately plead her breach of contract claim. The Plaintiff then filed her Second Amended Complaint. Doc. 33. The Second Amended Complaint includes claims for Title VII Sex

Discrimination (Count I); Title VII Sex-Based Harassment (Count II); Title VII Retaliation (Count III); Equal Pay Act Discrimination (Count IV); Florida Civil Rights Act ("FCRA") Sex Discrimination (Count V); FCRA Sex-based Harassment (Count VI); FCRA Retaliation (Count VII); Defamation Per Se (Count VIII); and Breach of Contract (Count IX). The Defendants moved to dismiss Count IX, and their motion was denied. Doc. 41.

### III.    Legal Standards

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

## IV.     Analysis

### A.  Statute of Limitations

The Defendants argue that "virtually all [of Plaintiff's] allegations are time-barred." Doc. 95 at 14. However, with respect to the Title VII claims, the statute of limitations does not "bar an employee from using the prior acts as background evidence to support a timely claim" under Title VII. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102 (2002). The Defendants claim that virtually all the Title VII articulations are precluded, other than those related to the retaliation claim and an Amerihome account. That is simply not true. For example, the Plaintiff states in her sworn declaration that in early January of 2018, accounts (Flagstar and Freedom, not Amerihome) were again taken away from her because he could no longer "protect her from the Indians;" Mr. Taylor had previously explained to her that he felt the need to "protect her from the Indians" because she was a woman making too much money. Doc. 108-49 at 13.

As for the Breach of Contract claim, it is not time barred by the relevant four-year statute of limitations. The Plaintiff alleges that the contract was for an annual amount of compensation; thus, it would not be possible for a breach to occur at the time of the first paycheck, which was in May of 2013. Doc. 107 at 27. According to the Plaintiff, the Defendants did not breach the alleged contract until they failed to, at the close of that year, pay the Plaintiff the agreed upon pay. *Id.* It is possible that the initial breach occurred more than four years prior to the filing of the initial Complaint on May 17, 2018. Nevertheless, according to the Plaintiff's sworn declarations, the Defendants failed to pay her the amounts owed in the years that followed and thus, drawing all reasonable inferences in the Plaintiff's favor, they continued to breach the contract.[1] Those subsequent breaches are not barred by the statute of limitations.

_____

[1] The contract contemplated payment of commissions at different times in the future: it

**B. Disparate Treatment Sex Discrimination Claims Under Title VII and the Florida Civil Rights Act (Counts I and V)[2]**

The Defendants argue that they are entitled to summary judgment on Counts I and V, because there is no direct evidence of discrimination and because the Plaintiff cannot establish a prima facie case of sex discrimination under Title VII. Title VII forbids employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Contrary to the Defendants' contentions, there is direct evidence of such discrimination here. According to the Plaintiff's sworn declaration, Taylor—her supervisor—directly told her that he was taking away her accounts because leadership believed she was "making too much money as a female." Doc. 108-49 at 6. Based on the evidence produced by the Plaintiff, Taylor reiterated this repeatedly and continued to take away her accounts as recently as the first week of January in 2018. *Id.* at 13. Credited as true, the Plaintiff's evidence indicates that Taylor took her accounts away solely on the basis of the Plaintiff's sex. Accordingly, there is no need for the *McDonnell Douglas* burden-shifting framework here; the Plaintiff need not go through additional steps to establish a prima facie case. The Plaintiff has made a sufficient showing for her claims of intentional discrimination to go to a jury.

---

was a divisible contract. *Access Ins. Planners, Inc. v. Gee*, 175 So. 3d 921, 924 (Fla. 4th DCA 2015). With a divisible contract, performance is contemplated upon the occurrence of separate events, and the statute of limitations begins to run at the time of each breach. *Id.*

[2] Because claims under the FCRA are evaluated under the same analytical framework as Title VII claims, the Court discusses only the Title VII claims. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *St. Louis v. Fla. Int'l Univ.*, 60 So. 3d 455, 458 (Fla. Dist. Ct. App. 2011).

## C. Hostile Work Environment Claims (Counts II and VI)

The Defendants argue that the Plaintiff has failed to make a sufficient showing that she was subjected to a hostile work environment for purposes of her sex-based harassment claims. To establish a claim for hostile work environment discrimination the Plaintiff must show: (1) she belongs to a protected group, (2) she has been subject to unwelcome harassment; (3) the harassment was based upon her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) the defendant is responsible for such an environment. *Adams v. Austal*, U.S.A., L.L.C., 754 F.3d 1240, 1248−49 (11th Cir. 2014) (citation omitted). The fourth element contains both a subjective and an objective component. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc). The Plaintiff must "subjectively perceive the harassment as severe or pervasive enough to change the terms or conditions of employment, and [her] subjective perception must be objectively reasonable." *Reeves*, 594 F.3d at 809 (citations omitted).

In considering whether the alleged harassment is objectively severe, courts consider, inter alia: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276; *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997).

It is unclear what, specifically, created the hostile work environment. According to the Plaintiff, "adverse actions"[3] included:

---

[3] Bizarrely, the Plaintiff tries to employ the retaliation framework from the progeny of *McDonnell Douglas* for all of her Title VII and FCRA claims. That framework is inapplicable and, all told, nonsensical if it were to be applied to her hostile work environment and disparate treatment claims. Neither of those types of claims involved protected activity.

a farcical "shushing" investigation, difficult travel schedules, denied ability to work remotely, diminished resources and assistance, removed accounts, exclusion from conferences and meetings, threats against obtaining counsel, refusal to investigate her claims, reduced commissions and income, lower commission percentage than similar male colleagues, termination despite whistleblower laws, threats to destroy her career, threats of suit, denied ability to cash out stock options, defamed reputation to colleagues and clients, and exclusion from the industry . . .

The Plaintiff does not distinguish between the different "adverse actions" for purposes of her disparate treatment, hostile work environment, or retaliation claims. It is difficult to ascertain what the Plaintiff believes was harassment. Indeed, the incidents named fit far better within the confines of the Plaintiff's other Title VII claims. The Plaintiff cites no evidence, even drawing all reasonable inferences in her favor, that indicates that her treatment amounted to harassment sufficient to establish her hostile work environment claims. Accordingly, the Defendants are entitled to summary judgment on Counts II and VI.

### D. Retaliation (Counts III and VII)

The Defendants argue that the Plaintiff has failed to establish a prima facie case for retaliation under Title VII. The *McDonnell Douglas* burden-shifting analysis applies in cases of retaliation relying on circumstantial evidence. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009). To establish a prima facie case for retaliation, a plaintiff must show that "(1) he engaged in statutorily protected activity, (2) he suffered a materially adverse action, and (3) there is a causal relationship between the two." *Schiele v. S. E. Showclubs, LLC*, No. 8:16cv-02308–JSM–MAP, 2017 WL 2834779, at *2 (M.D. Fla. June 30, 2017) (citing *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010)).

Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason . . . . If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and drops from the case. After

the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext . . . .

*Bryant* at 1307–08 (internal citations and quotation marks omitted).

The Defendants argue that, even if the January 10, 2018 letter was a statutorily protected activity, the Plaintiff was terminated for a legitimate, non-retaliatory reason: forwarding confidential and proprietary information to her personal e-mail account.

The Plaintiff has produced evidence indicating that the Defendants' proffered reason for terminating her is pretextual. According to deposition testimony from multiple employees, emailing documents to oneself was a common and open practice. Apparently, no employee was disciplined for doing so except for the Plaintiff, who happened to be fired shortly after confirming her EEOC charge. Furthermore, after the Plaintiff was terminated, other female employees were told that, if they ever filed a discrimination case, they would be "fired on the spot." Flowers Dep., Doc. 108-51, 122:1-10. Accordingly, the Plaintiff's retaliation claims survive the Defendants' Motion for Summary Judgment.

### E. Equal Pay Act (Count IV)

An employee demonstrates a prima facie case of an Equal Pay Act violation by showing that the employer paid employees of opposite genders different wages for equal work for jobs which require "equal skill, effort, and responsibility, and which are performed under similar working conditions." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077–78 (11th Cir. 2003) (internal quotations omitted). If the Plaintiff so demonstrates, the employer must show by a preponderance of the evidence that the different wages are justified based on one of the following: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality; and (4) a differential

based on any factor other than sex." *Slattery v. Precision Response Corp.*, 167 F. App'x 139, 142 (11th Cir. 2006).

The Plaintiff's sworn declaration indicates that the Salesperson, Client Services Manager, and Client Partner responsibilities were "virtually identical." Doc. 108-49 ¶ 40; *see also* Cox Dep., Doc. 108-59, 26:23-35. Accordingly, there is evidence that there was equal work for purposes of the EPA. And, the Plaintiff has produced some evidence that male employees were entitled to larger percentage commissions than she received. However, the Plaintiff has not argued, much less shown, that the male employees were in fact paid more than her. Accordingly, the Defendants are entitled to summary judgment on Count IV.

### F. Defamation Per Se (Count VIII)

To state a claim for defamation, "a plaintiff must allege that (1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff." *Valencia v. Citibank Int'l*, 728 So.2d 330, 330 (Fla. 3d DCA 1999). Under Florida law, "[d]efamation encompasses both libel and slander." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378 n.11 (S.D. Fla. 2006) (internal quotations and citation omitted).

Under Florida law, statements can be defamatory per se. *See Hoch v. Rissman*, 742 So. 2d 451, 457 (Fla. 5th DCA 1999). A statement is defamatory per se, "if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. 4th DCA) (internal quotations and citations omitted). In other words, the statements are "so obviously defamatory" and "damaging to [one's] reputation" that they "give[ ] rise to an absolute

presumption both of malice and damage." *Wolfson v. Kirk*, 273 So.2d 774, 776 (Fla. 4th DCA 1973); *see Campbell v. Jacksonville Kennel Club, Inc.*, 66 So.2d 495, 497 (Fla. 1953).

In an action for defamation per se, consideration is given only to the four corners of the publication, and the language used should be interpreted as the "common mind" would normally understand it. *O'Neal v. Tribune Co.*, 176 So. 2d 535 (Fla. 2d DCA 1965). The "'common mind' rule simply means that the words should be given a reasonable construction in view of the thought intended to be conveyed and that which would be a reasonable construction of the language by those who heard [the] same." *Wolfson*, 273 So. 2d at 778.

First, the Defendants argue that the alleged statements are not defamatory per se. However, the Plaintiff produced deposition evidence from which a reasonable jury could find that the Plaintiff's coworkers were told that she committed "a very serious offense." Doc. 108-50 at 213. Multiple coworkers testified that they thought the Plaintiff must have done something terribly unethical based on what they were told. Such statements would certainly tend to injure the Plaintiff's trade or profession.

The Defendants also argue that, despite the Plaintiff's claims that they defamed her, all of their statements were true. "[U]nder Florida law, truth is only a defense to defamation when the truth has been coupled with good motive." *Lipsig v. Ramlawi*, 760 So. 2d 170, 183 (Fla. 3d DCA 2000). Truth and good motive are jury issues. *Id.* There remain genuine disputes of material fact with respect to both the truth of and the motive behind the statements at issue.

The Defendants also raise a qualified privilege defense. "[I]n order for a communication to be qualifiedly privileged, it must be made by one who has a duty or interest in the subject matter and to one who has a corresponding duty or interest." *Teare v. Local Union No. 295 of the United Ass'n of Journeymen & Apprentices of Plumbers & Pipe Fitters Indus. of U.S. & Canada*, 98 So. 2d 79,

83 (Fla. 1957). The statement must be made without malice, and "there must be a mutuality of interest or duty or both existing between the person who makes the statement and the person to whom the statement is made." *Id.* Here, the Plaintiff has produced deposition testimony from several employees that could support a jury's finding of malice. Accordingly, there remain disputed issues of material fact with respect the qualified privilege defense.

### G. Breach of Oral Contract (Count IX)

Under Florida law, to prevail on a breach of contract claim, plaintiff must establish "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 857 F. Supp. 2d 1294, 1301 (S.D. Fla. 2012) (quoting *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009)). A contract is not enforceable unless "'there has actually been a meeting of the minds of the parties upon definite terms and conditions which include the essential elements of a valid contract.'" *Leopold v. Kimball Hill Homes Fla., Inc.*, 842 So. 2d 133, 136 (Fla. 2d DCA 2003) (quoting *Mehler v. Huston*, 57 So.2d 836, 837 (Fla. 1952)). "Furthermore, to prove a breach of an oral contract, a plaintiff must establish that the parties mutually assented to a certain and definite proposition and left no essential terms open." *Merle Wood & Assocs., Inc.*, 857 F. Supp. 2d at 1301 (internal quotation marks and citations omitted).

The Defendants first argue that Count IX is barred by the statute of frauds. However, "[o]nly if a contract could not possibly be performed within one year would it fall within the statute." *Butterworth v. Lab. Corp. of Am. Holdings*, 581 F. App'x 813, 819 (11th Cir. 2014). As this Court explained in its previous Order (Doc. 41), that is not the case here. To the extent there is an oral contract, it is not barred by the statute of frauds. In her sworn declaration, Plaintiff claims that she has not received commission compensation that she was owed based on the agreement between her

and the Defendants. *See, e.g.* Doc. 108-49 at 13-14. Accordingly, drawing all reasonable inferences in the Plaintiff's favor, a jury could find that she and the Defendants entered into an oral contract for commissions to be paid to the Plaintiff, and that the Defendants breached that contract when they failed to pay the agreed upon commissions.

## V.        Conclusion

For the foregoing reasons, the Motion for Summary Judgment is **GRANTED** as to Counts II, IV, and VI, and **DENIED** as to all other counts.


**DONE** and **ORDERED** in Chambers, Orlando, Florida on January 28, 2020.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE


Copies furnished to:

Counsel of Record
Unrepresented Party